**Not for Publication**

# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| **MYRNA DIAZ,** | |
| **Petitioner,** | **Civil Action No. 18-12647 (ES)** |
| **v.** | **OPINION** |
| **SARAH DAVIS, et al.,** | |
| **Respondents.** | |

**SALAS, DISTRICT JUDGE**

Before the Court is Petitioner, Myrna Diaz's, petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. (D.E. No. 1 ("Petition" or "Pet.")). Having considered the parties' submissions, the Court decides this matter without oral argument. *See* Fed. R. Civ. P. 78(b); L. Civ. R. 78.1(b). For the reasons set forth herein, the Court **DENIES** the Petition and **DENIES** a certificate of appealability.

## I.  BACKGROUND

In 2006, Petitioner was convicted in state court of first-degree felony murder, first-degree robbery, and related offenses arising from her participation in a robbery with two codefendants, McDonald Williams and Mark Warner. The New Jersey Superior Court, Appellate Division (the "Appellate Division"), provided the following summary of the evidence presented at trial:

> The victim, Jose Cabrera, owned and operated an auto repair shop in Newark. On October 9, 2006, his employees discovered his body lying face down in a pool of blood in the office.
>
> One of the employees flagged down a passing patrol car and detectives from the Essex County Prosecutor's Office were assigned to investigate. The detectives saw that Cabrera had been severely beaten and that his legs and wrists were bound.

In the office, the detectives observed a safe, that had been turned upside down and pried open on the bottom.  The detectives found a steel pry bar, a hand truck, an electric drill, an impact gun, a lug wrench, a hammer, and a circular saw inside the office.   The employees reported that these items were normally kept in the shop.  The detectives also recovered a knife with a broken handle from the scene.  There were no signs of a forced entry, which led the detectives to believe Cabrera knew the perpetrators.

Cabrera's family reported that Cabrera always kept two cell phones with him at all times.  However, the phones were not found on the premises.  Further investigation revealed that one of the phones had been used to call Warner.  The detectives also learned that Cabrera's credit card had been used after his death at three local stores and a gas station.  Less than $1000 had been charged to the account.

A loss specialist for one of the stores supplied the detectives with a surveillance video.  The video was date-stamped October 10, 2006.  [Petitioner] was seen on the video with Warner bagging groceries.  The video also showed Warner swiping Cabrera's credit card at the register.   However, the card was declined, and [Petitioner] and Warner then left the store.

On October 18, 2006, the detectives located [Petitioner] and asked her to come to the police station for questioning.  She agreed to do so and gave a recorded statement to Detective Peter Chirico after he provided her with the standard *Miranda* [*v. Arizona*, 384 U.S. 436 (1966)] warnings.  [Petitioner] denied having any knowledge about what had happened to Cabrera.  The tape was played for the jury.

Detective Chirico did not arrest [Petitioner] at that point.  Instead, he made arrangements for her to be transported to "wherever she was going."  While waiting for her ride, however, [Petitioner] approached the detective and asked to speak to him.  After again reading her the *Miranda* warnings, Detective Chirico took a second, recorded statement from [Petitioner].  This recording was also played for the jury.

This time, [Petitioner] stated Cabrera was her former boyfriend and that she had visited him at his shop on October 6, 2006.  After she left, she saw Warner and Williams at the corner and they stopped to ask her about the shop.  She knew both men and, over the past "two to three weeks[,]" she had been sexually intimate with Williams.  [Petitioner] stated Williams refused to let her leave.  The men told [Petitioner] she had to accompany them to the shop.

2

[Petitioner] also stated that, on Sunday, October 8, 2006, she and the two men went to the shop. Warner went in first and punched Cabrera. Warner and Williams wanted Cabrera to open the safe, but he refused. The men continued to hit Cabrera and [Petitioner] stated "they were hitting [him], they were punching and then they used a long metal piece, it looked like part of a car or a truck or something." [Petitioner] claimed they told Cabrera, "open the safe or I'm going to slit your girlfriend's throat . . . ." Williams then told Warner to take [Petitioner] to the garage and he did so.

[Petitioner] stated Williams began to beat Cabrera and she could hear "hitting" and "banging" as Williams tried to open the safe. [Petitioner] claimed Warner held a knife to her throat while they were in the garage to keep her from leaving. When Williams later came into the garage, [Petitioner] saw that "his boots were bloody." Williams kept "going in and out" of the office and Warner kept watch. [Petitioner] stated that when Williams "came out for the last time, he just said, let's go. Get up and let's go." As she left, [Petitioner] saw Cabrera lying on the floor and "there was blood, a lot of blood . . . ."

[Petitioner] admitted that Cabrera's credit cards were taken from the office. She also admitted using one of the cards with Warner "to buy bulk food" at the grocery store.

In January 2009, [Petitioner] gave a third statement about the incident during an interview [in connection with an unrelated legal matter] she had with Assistant Prosecutor Naazeen Khan. [Petitioner] stated she drove Warner and Williams to Cabrera's shop and that she knew "a robbery was going to take place . . . ." However, she denied knowing the men intended to harm Cabrera. [Petitioner] told Khan she remained in the car during the entire incident.

The medical examiner characterized Cabrera's death as a homicide, and testified the cause of death was from a traumatic brain injury. Cabrera suffered numerous lacerations, abrasions, and contusions on his scalp, face, shoulder, elbow, and forearm. Both of his eyes were swollen, and he had two lacerations of various sizes on or near the top of his head, two on the back of his head, and one on each side of his head. He also had multiple fractures to the right side of his skull and a fracture that extended from the top of his skull to the base of his skull.

The medical examiner stated that Cabrera had also been attacked with a serrated knife and had a superficial wound to his neck below his Adam's apple. Cabrera's left humerus, right scapula, and five of his

3

ribs were fractured, and his left shoulder joint was dislocated. The medical examiner opined that a heavy weapon with sharp edges was used during the attack. She also observed that Cabrera's ankles were bound with electrical cord, and he had no defensive wounds to his hands.

[Petitioner] testified on her own behalf. She stated she was having an affair with Cabrera, who provided her with financial help for her apartment. She met Williams two or three weeks before the date of the murder and began having a sexual relationship with him. Williams supplied her with drugs. Through Williams, [Petitioner] met Warner. [Petitioner] stated she continued to see Cabrera, "but not on an intimate level."

[Petitioner] testified she went to Cabrera's shop on October 6, 2006 for help with paperwork regarding the purchase of a truck by her nephew. On October 9, she stated she was at Warner's girlfriend's home when Williams and Warner arrived with a "grocery cart." There were a number of items in the cart, including "a black bag, it had credit cards in it." One of the cards belonged to Cabrera. [Petitioner] said she used [the] card twice with Warner and Williams because they threatened her and her children if she did not. She claimed she was "just a follower there, a body standing there."

[Petitioner] testified she was "high" on drugs when she met with Detective Chirico on October 18, 2006. She stated she did not respond to the questions he asked until an officer struck her on the arm. She also claimed she was "confused" about her *Miranda* rights. She stated she only gave a statement to the detective because she wanted to leave. [Petitioner] testified she was not present when Cabrera was beaten and killed and did not tell Williams and Warner that Cabrera had a safe.

*State v. Diaz*, No. A-4378-10T1, 2013 WL 6050161 at *1–3 (N.J. Super. Ct. App. Div. Nov. 18, 2013). Petitioner's convictions were subsequently affirmed by the Appellate Division. *Id.* Ms. Diaz then filed a petition for certification, which the New Jersey Supreme Court denied on June 24, 2014. *State v. Diaz*, 94 A.3d 911 (N.J. 2014).

Thereafter, Ms. Diaz filed a petition for post-conviction relief ("PCR") which was denied on August 19, 2015, by the PCR trial court. (D.E. No. 9–18 at 3–25 ("PCR Opinion")). Petitioner appealed, and the Appellate Division affirmed the denial. *State v. Diaz*, No. A-0487-15T2, 2017

4

WL 5076368 (N.J. Super. Ct. App. Div. Oct. 30, 2017).  Subsequently, Ms. Diaz filed a petition

for certification, which the New Jersey Supreme Court also denied.  *State v. Diaz*, 181 A.3d 248

(N.J. 2018).

On July 27, 2018, Ms. Diaz filed the instant Petition, alleging ten claims for relief.  (*See*

Pet.).  Respondents filed an answer on May 10, 2019.  (D.E. No. 9 ("Answer")).  Petitioner

requested an extension of time to file a reply to Respondents' Answer, (*see* D.E. No. 15), the Court

granted Petitioner's request, however, a reply was never filed.

## II.    STANDARDS OF REVIEW

Under the Antiterrorism and Effective Death Penalty Act ("AEDPA"), Pub. L. No. 104-

132, 110 Stat. 1214 (1996), amending 28 U.S.C. § 2254, a district court "shall entertain an

application for writ of habeas corpus [o]n behalf of a person in custody pursuant to the judgment

of a State court only on the ground that he is in custody in violation of the Constitution or laws or

treaties of the United States."  28 U.S.C. § 2254(a).  Habeas petitioners bear the burden of

establishing their entitlement to relief for each claim presented in a petition based upon the record

that was before the state court.  *See Eley v. Erickson*, 712 F.3d 837, 846 (3d Cir. 2013); *Parker v.

Matthews*, 567 U.S. 37, 41 (2012).  District courts are required to give great deference to the

determinations of the state trial and appellate courts.  *Renico v. Lett*, 559 U.S. 766, 772–73 (2010).

Specifically, district courts must defer to the "last reasoned decision of the state courts on the

petitioner's claims."  *Simmons v. Beard*, 590 F.3d 223, 231–32 (3d Cir. 2009) (internal quotation

marks and citation omitted).  Moreover, a federal court reviewing the state court's adjudication

under § 2254(d)(1) must confine its examination to evidence in the record.  *Cullen v. Pinholster*,

563 U.S. 170, 181–82 (2011).

Where a claim has been adjudicated on the merits by the state courts, the district court shall not grant an application for writ of habeas corpus unless the state court adjudication:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). "Contrary to clearly established Federal law" means (i) that the state court applied a rule that contradicted the governing law set forth in United States Supreme Court precedent or (ii) that the state court confronted a set of facts that were materially indistinguishable from United States Supreme Court precedent and arrived at a different result than the Supreme Court. *Eley*, 712 F.3d at 846 (citing *Williams v. Taylor*, 529 U.S. 362, 405–06 (2000)). "'[C]learly established Federal law' for purposes of § 2254(d)(1) includes only the holdings, as opposed to the dicta, of [the United States Supreme] Court's decisions." *See Woods v. Donald*, 575 U.S. 312, 316 (2015). An "unreasonable application" of clearly established federal law is a court's "objectively unreasonable" application of law, not merely a court's erroneous application. *Eley*, 712 F.3d at 846 (quoting *Renico*, 559 U.S. at 773).

"When reviewing state criminal convictions on collateral review, federal judges are required to afford state courts due respect by overturning their decisions only when there could be no reasonable dispute that they were wrong." *Woods*, 575 U.S. at 316. Where a petitioner challenges an allegedly erroneous factual determination of the state courts, "a determination of a factual issue made by a State court shall be presumed to be correct [and t]he applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1). Furthermore, "[w]hen a state court arrives at a factual finding based on credibility determinations, the habeas court must determine whether that credibility determination

6

was unreasonable." *See Keith v. Pennsylvania*, 484 F. App'x 694, 697 (3d Cir. 2012) (citing *Rice v. Collins*, 546 U.S. 333, 339 (2006)).

## III.   DISCUSSION

### A.   Claims Regarding Statements to the Assistant Prosecutor

The Court first addresses several related claims Petitioner raises regarding the trial court's admission of statements Petitioner made to Assistant Prosecutor Naazeen Khan during an interview regarding an unrelated criminal matter in which Petitioner was a potential victim.  The PCR trial court summarized the facts underlying these claims as follows:

> Petitioner complained that she was sexually harassed by a prison guard.  [Assistant Prosecutor ("AP") Naazeen Khan] was assigned to investigate the complaint.  [In January 2009,] Petitioner was brought to AP Khan's office, and according to Khan, was allowed to consult with her plea attorney, Ms. Scarrillo, prior to the interview.  AP Khan advised Ms. Scarrillo that she would not discuss the homicide with [Petitioner].  Prior to the interview, Ms. Scarrillo met with [Petitioner], and then informed AP Khan that she was "completely comfortable" with allowing her client to be interviewed and that it was "okay" to talk with her client.  Ms. Scarrillo further advised AP Khan that it was not necessary for her to be present during her client's discussion with AP Khan.  When AP Khan interviewed Petitioner, Ms. Diaz was awaiting sentence after entering into a cooperating plea agreement.  Under the terms of the agreement, it was contemplated that Ms. Diaz would testify as a State's witness at a trial of her co-defendants.  Petitioner had not yet moved to withdraw her guilty plea.
>
> AP Khan then proceeded to interview Petitioner without her attorney present, though the subject of the interview was limited to the sexual harassment complaint.  During the interview, [Petitioner] brought up the homicide and continued to discuss it, even after Detective Graves advised her that "she did not to have to discuss the homicide with us, that we were not there to discuss the homicide."  [According to Khan,] Petitioner expressed regret for participating in the crimes, but stated that she only drove her co-defendants to the auto body shop and remained in the car while they committed the crimes.  Petitioner knew that a robbery was going to be committed, but stated that she did not know that her co-defendants intended to murder anyone.

(PCR Opinion at 7–8).

Over a year later, and against her counsel's advice, Petitioner filed a *pro se* motion to withdraw her guilty plea. *Diaz*, 2017 WL 5076368, at *2. Petitioner also sought to relieve trial counsel from representing her. *Id.* With the State's consent, the court granted the motion and assigned her new counsel. *Id.*

Prior to trial, new trial counsel moved to suppress Petitioner's statements to Khan at the January 2009 interview. *Id.* The trial judge held a pretrial hearing regarding the admissibility of these statements and ruled that they were inadmissible. (D.E. No. 19-4 at 9:12–11:17).

At trial, Petitioner testified on her own behalf. *Diaz*, 2017 WL 5076368, at *2. In contrast to what she had told Khan, Petitioner testified that she was at her friend Michelle Millner's apartment when the robbery/homicide occurred. *Id.* Petitioner also denied making any statements to Khan regarding the robbery/homicide during the January 2009 interview. (D.E. No. 19-7 at 48:18–49:18).

The prosecutor then called Khan to rebut Petitioner's testimony. This time, the trial judge ruled that Petitioner's statements to Khan were admissible to challenge Petitioner's credibility. (*Id.* at 3:17–9:21). Khan ultimately testified regarding the substance of Petitioner's statements during the January 2009 interview. *Diaz*, 2017 WL 5076368, at *3.

### 1.    Due Process Claim (Ground One)

Petitioner first argues that the trial court violated her due process rights by admitting the statements she made to Khan at trial. (Pet. at 6).

As an initial matter, Petitioner failed to exhaust this claim before the state courts. *See* 28 U.S.C. § 2254(b)(1)(A) (stating that an application for a writ of habeas corpus shall not be granted unless it appears that the applicant has exhausted available state remedies). To meet the exhaustion

requirement, a petitioner must "fairly present" her federal claims to each level of the state courts empowered to hear them, either on direct appeal or in collateral post-conviction proceedings. *See O'Sullivan v. Boerckel*, 526 U.S. 838, 847 (1999). This means that the petitioner must "present a federal claim's factual and legal substance to the state courts in a manner that puts [the state courts] on notice that a federal claim is being asserted." *McCandless v. Vaughn*, 172 F.3d 255, 261 (3d Cir. 1999).

Here, Petitioner did not raise Ground One on direct or PCR appeal. Accordingly, the claim is unexhausted. *See id.* at 261. Nevertheless, a habeas court can, if appropriate, deny a petitioner's unexhausted claims on the merits, pursuant to 28 U.S.C. § 2254(b)(2). *See Taylor v. Horn*, 504 F.3d 416, 427 (3d Cir. 2007). Where the state courts have not "reached the merits of a claim thereafter presented to a federal habeas court," the federal court must "conduct a *de novo* review over pure legal questions and mixed questions of law and facts . . . ." *Id.* at 429. Even on *de novo* review of a habeas claim, however, the state court's factual determinations are still presumed to be correct, unless a petitioner rebuts them with clear and convincing evidence. *Appel v. Horn*, 250 F.3d 203, 210 (3d Cir. 2001) (citing 28 U.S.C. § 2254(e)(1)). The Court proceeds to analyze the claim pursuant to Section 2254(b)(2).

To prevail on her due process claim, Petitioner must prove that she was deprived of "fundamental elements of fairness in [her] criminal trial." *Riggins v. Nevada*, 504 U.S. 127, 149 (1992). This is a heavy burden. *See Glenn v. Wynder*, 743 F.3d 402, 407 (3d Cir. 2014). The Supreme Court has "defined the category of infractions that violate 'fundamental fairness' very narrowly, based on the recognition that, beyond the specific guarantees enumerated in the Bill of Rights, the Due Process Clause has limited operation." *Medina v. California*, 505 U.S. 437, 443 (1992).

In this case, Petitioner fails to demonstrate that the trial court's admission of the statements to Khan undermined the fundamental fairness of her entire trial.  *See Riggins*, 504 U.S. at 149. Other than Petitioner's subsequent claim that the admission of the statements violated her Fifth and Sixth Amendment right to counsel, which the Court explains is meritless below, Petitioner offers no substantive argument as to why the admission of these statements was fundamentally unfair.  (*See* Pet. at 6).  Moreover, the Court discerns no injustice.  The trial court initially ruled that the statements were inadmissible and only decided to admit them after they became relevant to Petitioner's credibility when she elected to testify regarding an alibi that was inconsistent with what she had told Khan during the January 2009 interview.  The Court cannot say that this decision undermined the fundamental fairness of her entire trial.  Accordingly, the admission of the statements did not violate due process, and the Court denies Ground One.

### 2.    Fifth and Sixth Amendment Right to Counsel Claim (Ground Three)

Petitioner next argues that the trial court violated Petitioner's Fifth and Sixth Amendment rights to counsel by admitting her statements to Khan at trial.  (Pet. at 9).  Preliminarily, Petitioner once again failed to exhaust this claim before the state courts because she did not raise Ground Three on direct or PCR appeal.  *See McCandless*, 172 F.3d at 261.  Nonetheless, this Court proceeds to analyze the claim pursuant to 28 U.S.C. § 2254(b)(2).

A defendant has a Fifth Amendment right to counsel during custodial interrogations by state officials.  *See Miranda*, 384 U.S. at 477–79.  In determining whether a person is in custody for Fifth Amendment purposes, courts must ascertain: (i) whether, in light of "the objective circumstances of the interrogation," a "reasonable person [would] have felt he or she was not at liberty to terminate the interrogation and leave"; and (ii) whether the relevant environment presents the same inherently coercive pressures as the type of station house questioning at issue in *Miranda*.

*See Howes v. Fields*, 565 U.S. 499, 509 (2012).  Interrogation refers to express questioning or its functional equivalent, including any words or actions on the part of the state actors that they know are reasonably likely to elicit an incriminating response from the defendant.  *See Rhode Island v. Innis*, 446 U.S. 291, 300–01 (1980).

A defendant facing actual imprisonment also has a Sixth Amendment right to counsel for "critical stages" of a prosecution that occur after the commencement of adverse judicial proceedings.  *See Massiah v. United States*, 377 U.S. 201 (1964).  "Critical stages" are those phases of the prosecution where a lawyer's presence would safeguard against some inherent danger of unfairness in the proceeding, including post-indictment interrogations by the state.  *See Padilla v. Kentucky*, 559 U.S. 356, 389 (2010).  The Sixth Amendment right to counsel, however, is offense-specific and applies only to offenses with which the defendant has been charged.  *Texas v. Cobb*, 532 U.S. 162, 164 (2001).  Thus, "'post-charge deliberate elicitation of statements without the defendant's counsel or a valid waiver of counsel is not intrinsically unlawful' . . . when the questioning is unrelated to charged crimes."  *Kansas v. Ventris*, 556 U.S. 586, 592 (2009).

A statement obtained in violation of a defendant's Fifth or Sixth Amendment right to counsel may not be used as substantive evidence in the prosecution's case in chief.  *See Michigan v. Harvey*, 494 U.S. 344, 350 (1990).  However, a statement obtained in violation of a defendant's Fifth or Sixth Amendment right to counsel is admissible to impeach the defendant's inconsistent trial testimony.  *Harris v. New York*, 401 U.S. 222, 226 (1971) ("The shield provided by [*Miranda*] cannot be perverted into a license to use perjury by way of a defense, free from the risk of confrontation with prior inconsistent utterances."); *Ventris*, 556 U.S. at 594 (holding that an informant's testimony, concededly elicited in violation of the Sixth Amendment, was admissible to challenge a defendant's inconsistent testimony at trial).

Here, Petitioner's allegation that the trial court violated Petitioner's Fifth and Sixth Amendment right to counsel by admitting the statements at trial is meritless because no Fifth or Sixth Amendment violation occurred.  The statements at issue were not elicited by express questioning or actions that were reasonably likely to elicit an incriminating response.  Instead, Petitioner brought up the homicide on her own accord and continued to discuss it even after Detective Graves advised her that they were not there to discuss the homicide and that she did not have to talk about it.  Thus, the questioning of Petitioner as a potential victim of alleged acts of harassment by prison officials did not constitute an interrogation within the meaning of the Fifth Amendment, and, therefore, did not violate Petitioner's Fifth Amendment right to counsel.  *See Howes*, 565 U.S. at 509; *Innis*, 446 U.S. at 300–01.  In addition, because the Sixth Amendment right to counsel is offense-specific, and the questioning was unrelated to any charged offense, no violation of the Sixth Amendment right to counsel occurred.  *See Cobb*, 532 U.S. at 164; *Ventris*, 556 U.S. at 592.

Moreover, even if Assistant Prosecutor Khan's conduct constituted a violation of Petitioner's Fifth or Sixth Amendment right to counsel, the trial court did not err by admitting the statements for impeachment purposes.  Due to Petitioner's inconsistent testimony at trial, the statements at issue became admissible to impeach Petitioner's inconsistent trial testimony.  *Harris*, 401 U.S. at 226; *Ventris*, 556 U.S. at 594.  For these reasons, Petitioner is not entitled to habeas relief on Ground Three.

### 3.      Ineffective Assistance of Counsel Claims (Ground Four, Subpart One; Ground Seven)

In Ground Four, Subpart One, Petitioner argues that her trial counsel rendered ineffective assistance of counsel by failing to appear or be present during Assistant Prosecutor Khan's interview of Petitioner.  (Pet. at 10).  Likewise, in Ground Seven, Petitioner argues that her direct

appeal counsel rendered ineffective assistance by failing to appeal the trial court's ruling permitting Petitioner's statement to Assistant Prosecutor Khan to be used at trial.  (*Id.* at 15).

The two-prong test set forth in the Supreme Court's opinion in *Strickland v. Washington*, governs claims asserting ineffective assistance of counsel.  466 U.S. 668, 687 (1984).  To make out such a claim under *Strickland*, a petitioner must first show that "counsel's performance was deficient."  *Id.*  "To establish deficient performance, a person challenging a conviction must show that 'counsel's representation fell below an objective standard of reasonableness.'"  *Harrington v. Richter*, 562 U.S. 86, 104 (2011).  A petitioner must also show that counsel's allegedly deficient performance prejudiced her defense such that the petitioner was "deprive[d] of a fair trial . . . whose result is reliable."  *Strickland*, 466 U.S. at 687.  To establish prejudice, a petitioner "need not establish that the attorney's deficient performance more likely than not altered the outcome" of the petitioner's case, but only that there is a reasonable probability of such an effect upon the outcome of the case.  *Nix v. Whiteside*, 475 U.S. 157, 175 (1986).

With these principles in mind, the Court considers Petitioner's claims.  Here, Petitioner exhausted the claims after presenting them to each level of the state court appellate process in her PCR proceedings, including the New Jersey Supreme Court, who summarily denied these claims on PCR appeal.  *See Diaz*, 181 A.3d at 484.  This Court now "look[s] through" the summary denial and applies AEDPA's standards to the Appellate Division's determination on PCR appeal.  *See Simmons*, 590 F.3d at 231–33.

The Appellate Division denied Petitioner's claims pursuant to New Jersey Rule 2:11-3(e)(2), offering the following:  "We affirm substantially for the reasons Judge Cronin expressed in his cogent written opinion.  We discern no abuse of discretion in the denial of [Petitioner's]

motion for a new trial and PCR petition."[1]  *See Diaz, 2017 WL 5076368, at \*5.*  Because the

Appellate Division affirmed "substantially for the reasons" set forth by the PCR trial court, this

Court also considers the reasoning of that court.  *See, e.g.*, *Harris v. Nogan*, No. 14-5408, 2017

WL 5451746 (D.N.J. Nov. 14, 2017) (considering the reasoning of the PCR trial court where the

Appellate Division affirmed based on New Jersey Rule 2:11-3(e)(2) and substantially for the

reasons stated by the PCR trial Court).

In denying Petitioner's ineffective counsel claims, the PCR court applied the *Strickland*

standard.  Thus, the PCR court first determined that Petitioner failed to demonstrate that her trial

counsel's performance was deficient because "Petitioner lacked a right to counsel concerning her

allegations of sexual harassment and official misconduct which were the subject matter of her

interview by AP Khan."  (PCR Opinion at 18).  Second, the PCR court determined that Petitioner

also failed to "demonstrate prejudice under *Strickland's* second prong."  (*Id.* at 18–19).  On the

latter point, the PCR court reasoned:

> Petitioner provided three different accounts of her involvement in the
> crimes, and admitted that she had lied to detectives on at least two
> occasions, (T7:26-1 to 30-24; 7T:43-1 to 43-25; T7:54-10 to 54-20).
> Thus, it is unlikely that a jury would have found any of Petitioner's
> exculpatory versions credible, even absent AP Khan's testimony.
> This is especially true in light of the overwhelming evidence against
> Petitioner, including her own admissions during cross-examination
> at trial.

(*Id.*).  Third, as it relates to any failures to raise Petitioner's Sixth Amendment right to counsel

claim on direct appeal, the court determined that Petitioner failed to demonstrate deficient

performance because Petitioner had no Sixth Amendment right to counsel for the interview with

Assistant Prosecutor Khan.  Even if she did, however, the United States Supreme Court has held

---

[1]      New Jersey Rule 2:11-3(e)(2) provides that "when in an appeal in a criminal . . . matter, the Appellate
Division determines that some or all of the arguments made are without sufficient merit to warrant discussion in a
written opinion, the court may affirm by specifying such arguments and quoting this rule and paragraph."

that statements obtained in contravention of the Sixth Amendment are nonetheless admissible to challenge inconsistent testimony at trial.

Here, Petitioner fails to argue or demonstrate that the state courts' decisions were contrary to or an unreasonable application of clearly established federal law or were based on an unreasonable determination of the facts.  Moreover, the state courts properly applied the *Strickland* standard in assessing Petitioner's ineffective counsel claims.  It was reasonable for Petitioner's trial counsel to not attend the January 2009 meeting with Assistant Prosecutor Khan because it had nothing to do with charged crimes and Assistant Prosecutor Khan had assured counsel that she would not ask about the charges.  It was also reasonable for Petitioner's appellate counsel to not challenge the trial court's admission of Petitioner's statements to Assistant Prosecutor Khan because the admission of those statements did not violate Petitioner's rights.  The Court, therefore, denies relief on Ground Four, Subpart One and Ground Seven.

### B.    Claims Relating to Project Freedom Fund (Grounds Two and Five)

Petitioner's second and fifth grounds for relief relatedly assert that Ms. Diaz was denied effective assistance of counsel when the Project Freedom Fund ("PFF"), an organization Petitioner characterizes as a "phony nonprofit," allegedly induced her to withdraw her guilty plea.  (Pet. at 7 & 12).  By way of background, on September 30, 2008, Petitioner pled guilty to first-degree aggravated manslaughter and first-degree robbery.  *Diaz*, 2017 WL 5076368, at *2.  In her factual basis, Petitioner admitted that she went with Warner and Williams to Cabrera's shop on October 8, 2006, to commit a robbery.  *Id.*  Petitioner further admits that the two men assaulted Cabrera in an attempt to get him to open his safe; she knew it was foreseeable that they could use force in committing the robbery.  *Id.*  Petitioner also admitted that Warner and Williams  did not care if Cabrera lived or died while they were hitting him; and Cabrera died as a result of his injuries.  *Id.*

Petitioner's admission also included statements that Warner and Williams took some items from Cabrera during the robbery, and she received Cabrera's credit. *Id.* After the robbery, Petitioner admitted to using the credit card once. *Id.*

As a part of Petitioner's PCR appeal, Petitioner alleges that after she had entered her guilty plea, but prior to sentencing, PFF approached her and induced her to withdraw her guilty plea. (Pet. at 7 & 12). Petitioner alleges that PFF drafted the motion to withdraw her plea, listing her name as the author of the motion, which was eventually granted. (*Id.*). Further, Petitioner claims that a PFF representative sat with assigned counsel during her subsequent trial. (*Id.*). Petitioner later learned that the PFF was not licensed to practice law in New Jersey and is now defunct. (*Id.* at 7 & 12). As such, Petitioner maintains that the "actions of PFF were inept" and "interfered with and undermined the work of [P]etitioner's assigned attorney Dana Scarrillo." (*Id.* at 12).

The New Jersey Supreme Court summarily denied these claims on PCR appeal. *See Diaz*, 181 A.3d at 484. Accordingly, the Court "look[s] through" the summary denial and applies AEDPA's standards to the Appellate Division's determination on PCR appeal. *See Simmons*, 590 F.3d at 231–33.

The Appellate Division denied these claims pursuant to New Jersey Rule 2:11-3(e)(2) and for substantially the same reasons as the PCR trial court. *Diaz*, 2017 WL 5076368, at *5. Accordingly, this Court also considers the reasoning of the PCR trial court.

The PCR trial court reasoned as follows:

> In the present case, Petitioner was represented by Dana Scarrillo when she filed her *pro se* motion to withdraw her guilty plea. (Pa1). Petitioner filed this motion against the advice of Ms. Scarrillo (See Pa9). Indeed, Petitioner filed a contemporaneous motion to have Ms. Scarrillo relieved as counsel. (Pa11-12). Essentially, Petitioner seeks to convert her decision to disregard the advice of plea counsel (Ms. Scarrillo) into a denial of her Sixth Amendment Right to counsel.

> Assuming arguendo that [Petitioner] could establish deficient (or nonexistent) performance as required by *Strickland's* first prong, she cannot establish the second prong. [Petitioner] now maintains her innocence. Rejecting a similar PCR claim, our Supreme Court in *State v. Taccetta*, "concluded, as a matter of law, that defendant could not have entered a plea of guilty to the purported plea proposal. We reach this conclusion for the simple reason that a defendant does not have the right to commit perjury in giving a factual basis for a crime he insists he did not commit." 200 N.J. 183, 194 (2009). A guilty plea requires the [Petitioner] to admit that she committed the crime to which she is pleading guilty. *See* R. 3: 9-2. In the present PCR, [Petitioner] maintains that she was innocent of the homicide and robbery crimes for which she now seeks to plead guilty. In *Taccetta*, the court recognized that "[t]he notion that a defendant can enter a plea of guilty, while maintaining his innocence, is foreign to our state jurisprudence." 200 N.J. at 195. The *Taccetta* Court further observed that "it is intolerable for a court to be complicit in accepting a guilty plea from a defendant protesting his innocence." *Id.* at 196.
>
> Seeking to avoid the proscriptions of *Taccetta*, [Petitioner] cites *Hines v. Ricci*, 2014 U.S. Dist. LEXIS 10801, 2014 W.L. 314430 (N.J. 2014). *Hines* is distinguishable, because defendant Hines did not testify as to his factual innocence for the charged murder. *Id.* at *29. Unlike defendant *Hines*, Petitioner Diaz testified at trial that she was not involved in the Cabrera, robbery/homicide. Moreover, in support of her motion to withdraw her guilty plea, Diaz certified that her earlier factual basis to the Cabrera robbery and homicide was untrue. Similar to *Taccetta*, to permit [Petitioner] Diaz to "reinstate her guilty plea" would render this court complicit with her perjury. Since this court does not accept Petitioner's invitation to be complicit in her perjury, *Hines* is distinguishable and [Petitioner's claim] is denied.

(PCR Opinion at 21–22 (citations omitted)).

Here, Petitioner fails to argue or demonstrate that the state courts' decisions were contrary to or an unreasonable application of clearly established federal law or were based on an unreasonable determination of the facts. For example, Petitioner does not identify, and the Court does not discern, any Supreme Court holding that the state courts contradicted or misapplied. As Petitioner fails to carry her burden under AEDPA, Grounds Two and Five are meritless.

Moreover, even when considering Petitioner's claims under *de novo* review, the claims still fail.  Although a defendant has a Sixth Amendment right to effective assistance of counsel in considering whether to accept or reject a plea bargain, "[t]he Sixth Amendment right to effective assistance of counsel . . . does not include the right to receive good advice from every lawyer a criminal defendant consults about his case."  *United States v. Martini*, 31 F.3d 781, 782 (9th Cir. 1994).  "If a criminal defendant in fact receives effective assistance from [her appointed attorney], [s]he cannot later claim that [s]he received ineffective assistance of counsel from another lawyer [s]he chose to consult."  *See id.* at 782–83; *Logan v. United States*, 910 F.3d 864, 872 (6th Cir. 2018) (concluding that, where two attorneys provided contrary advice regarding a plea offer but petitioner's counsel of record competently advised him of the risk of proceeding to trial, the petitioner was "provided all that the Sixth Amendment requires" under the circumstances notwithstanding that the other attorney's advice was admittedly deficient).

In this case, Ms. Scarrillo, Petitioner's counsel of record at the time, competently advised Petitioner not to withdraw her guilty plea, but Petitioner chose to disregard that advice.  Petitioner cannot now claim ineffective assistance because she chose to consult other attorneys who gave her poor advice.  *See Martini*, 31 F.3d at 782–83; *Logan*, 910 F.3d at 872.  Accordingly, the Court denies Grounds Two and Five.[2]

---

[2]      Petitioner also states that one of her assigned attorneys, Paul Bergin, was arrested on racketeering charges between the time of her guilty plea and the scheduled date of sentencing.  (Pet. at 12).  However, apart from simply recounting Bergin's arrest, Petitioner does not argue that Bergin's performance was deficient or prejudiced Petitioner in any way.  (*See id.*).  Accordingly, the Court does not construe the Petition as asserting an ineffective assistance claim based on Bergin's performance.  Even if the Court did construe it as such, Petitioner fails to carry her burden of demonstrating that she is entitled to relief.  *See Eley*, 712 F.3d at 846.

### C.      Claims Relating to Michelle Milliner's Statement

The Court next addresses several related claims regarding a recorded statement of Michelle Milliner,[3] co-defendant Warner's girlfriend.  Petitioner claims that the statement is "potentially exculpatory" because she thought "Milliner had told the police she was with [P]etitioner during the time of the robbery/homicide and that [P]etitioner was not involved in the crime."  (Pet. at 13).  In fact, the statement provided in relevant part reads as follows:

> Det. Rubin: Okay. Like I said, get into a little more detail. I think you said on last Monday [Petitioner] and Malique came to your house or came to apartment 1K-
>
> Ms. Milliner: Uh-huh.
>
> Det. Rubin: -- out of 991?
>
> Ms. Milliner: Uh-huh. Yes.
>
> Det. Rubin: And what did they have in their possession?
>
> Ms. Milliner: A lot of credit cards and a bunch of papers, a couple of dollars, money.  They had money.
>
> . . .
>
> Det. Rubin: Do you remember what time of day Monday it was?
>
> Ms. Milliner: It was Sunday.
>
> Det. Rubin: It was Sunday?
>
> Ms. Milliner: Yeah.
>
> Det. Rubin: Do you remember what time?
>
> Ms. Milliner: It was at night. It was dark because that's when we – [Petitioner] asked me [] did I want to go shopping.  It was night time.
>
> Det. Rubin: Okay. And did [Petitioner] or Malique (phonetic) say where they had gotten any of that stuff?

---

[3]      Ms. Milliner's first name is listed as Michelle, Marshell, and Marshall throughout the record.

> Ms. Milliner: No.  They just kept whispering and talking.  Kept putting stuff in that big black bag and pulling it back out, you know what I'm saying.  And then she asked me did I want to go to the store, No.  All of us went outside.  Then she asked me did I want to go to the store and I said yeah, I said because we didn't have no food.  They had brung back some liquor too.
>
> Det. Rubin: Now [Petitioner] or Malique never said where they got this stuff?
>
> Ms. Milliner: No.  I know they was acting crazy.
>
> Det. Rubin: They were acting crazy?
>
> Ms. Milliner: They were acting weird.
>
> Det. Rubin: When you say weird, how were they acting?
>
> Ms. Milliner: Not themselves.  Like shaky like.  Like hurry up and do this and hurry up and do-

(D.E. No. 20 ("Milliner Transcript") at 6:23–9:7).

The State did not produce the recording of Milliner's statement during discovery.  (*See* PCR Opinion at 5).  It did, however, provide defense counsel with a report by Detective Peter Chirico, which indicated that:

> [On October 16, 2006,] Detective D. Rubin and I obtained an audio statement from [Ms. Milliner] as part of a homicide investigation . . . . Miss Milliner stated that Malik [Williams] and Myra [Petitioner] came to her apartment with credit cards and cell phones they removed from a bag.  The group then went to Stop and Shop in Elizabeth after which they returned to her apartment and got high from smoking marijuana.

(*Id.* at 6).

The report further represented that, on October 25, 2006:  "The undersigned detective attempted to make a copy of the audio recording of the statement taken from [Ms.] Milliner.  While operating the audio tape copy machine within the robbery section[,] a malfunction occurred [which] unwilling[ly] erased the tape recorded statement."  (*Id.*).  Similarly, at a pretrial hearing,

20

Detective Chirico testified that "[w]hile trying to duplicate the audio cassette, the machine ripped the tape up so there is no statement of Mr. Warner's girlfriend/Fiancée."  (*Id.*).  Notwithstanding Detective Chirico's assertions, the recorded statement was later provided to trial counsel for co-defendant Williams in 2012.  (PCR Opinion at 6).

### 1.    Ineffective Assistance of Counsel Claim (Ground Four, Subpart Two)

In Ground Four, Subpart Two, Petitioner maintains that trial counsel was ineffective by failing to "demand a hearing regarding the Michelle Milliner statement and to call Milliner as a witness." (Pet. at 10).  Petitioner argues a hearing would have enabled the trial court to determine if the destruction of Milliner's videotaped statement was in bad faith and whether there was any prejudice to the defense.  (*Id.*).  Petitioner also alleges counsel failed to "request an 'adverse inference' jury charge resulting from the state's destruction of the physical evidence." (*Id.*).

Petitioner raised this claim on PCR appeal.  *Diaz*, 2017 WL 5076368, at *4–5.  The New Jersey Supreme Court summarily denied these claims on PCR appeal, *see Diaz*, 181 A.3d at 484, as such, the Court "look[s] through" the summary denial and applies AEDPA's standards to the Appellate Division's determination on PCR appeal.  *See Simmons*, 590 F.3d at 231–33.  *See Simmons*, 590 F.3d at 231–33.

The Appellate Division denied these claims pursuant to New Jersey Rule 2:11-3(e)(2) and for substantially the same reasons as the PCR trial court.  *Diaz*, 2017 WL 5076368, at *5. Accordingly, this Court also considers the reasoning of the PCR trial court.

The PCR trial court denied this claim finding that Petitioner failed to meet either prong required under *Strickland*.  (*Id.*).  The court noted that the pretrial discovery included Detective Chirico's report, which reflected that Ms. Milliner informed detectives that Petitioner arrived at her apartment with co-defendant Williams.  (*Id.* at 17).  The court found "in view of this

inconsistency as reflected in available discovery, any trial counsel decision not to locate or further interview Ms. Milliner 'falls within the wide range of reasonable professional assistance' which is not actionable under *Strickland*." (*Id.*).  Regarding the second prong of *Strickland*, the state court ruled "in light of the inculpatory effect of Ms. Milliner's statement and the overwhelming evidence of guilt, Petitioner also fails to establish prejudice as required by *Strickland*." (*Id.* at 17–18 (internal citations omitted)).

Here, Petitioner fails to argue or demonstrate that the state courts' determinations on this claim were contrary to, or an unreasonable application of, clearly established law, or were based on an unreasonable determination of the facts.  The PCR trial court properly applied the *Strickland* analysis to this claim and reasonably concluded that Petitioner failed to demonstrate deficient performance or prejudice.  Accordingly, the Court denies Ground Four, Subpart Two.

### 2.   *Brady* Claim (Grounds Six and Eight)

In Grounds Six and Eight, Petitioner argues that the PCR court should have granted Petitioner a new trial because of the prosecutor's failure to turn over Milliner's videotaped statement in violation of *Brady v. Maryland*, 373 U.S. 83 (1963). (*Id.* at 16).

Petitioner raised this claim on PCR appeal.  *Diaz*, 2017 WL 5076368, at *4–5.  The New Jersey Supreme Court summarily denied these claims on PCR appeal, *see Diaz*, 181 A.3d at 484, as such, the Court "look[s] through" the summary denial and applies AEDPA's standards to the Appellate Division's determination on PCR appeal.  *See Simmons*, 590 F.3d at 231–33.

The Appellate Division denied these claims pursuant to New Jersey Rule 2:11-3(e)(2) and for substantially the same reasons as the PCR trial court.  *Diaz*, 2017 WL 5076368, at *5.  Accordingly, this Court also considers the reasoning of the PCR trial court:

> Concerning Petitioner's due process or *Brady* claim, it is well-settled that the suppression by the prosecution of evidence favorable

to a defendant violates due process of law where the evidence is favorable to the defense, and is material.  In order to establish a *Brady* violation, defendant must show that: (1) the prosecution suppressed evidence; (2) the evidence is favorable to the defense; and (3) the evidence is material.  Exculpatory evidence includes evidence not only material that is directly exculpatory of a defendant, but also evidence that may impeach the credibility of a State witness.  The materiality standard is satisfied if defendant demonstrates that there is a reasonable probability that had the evidence been disclosed to the defense, the result of the proceeding would have been different.  Stated another way, the question is whether in the absence of the undisclosed evidence did the defendant receive a fair trial which is understood as a trial resulting in a verdict worthy of confidence.  If the undisclosed evidence was merely cumulative or repetitious as to the purpose for which it could have been used, the conviction should not be set aside.

During oral argument, PCR counsel properly conceded that Ms. Milliner's statement was not "clearly exculpatory."  It was far worse—Ms. Milliner's statement was inculpatory, as it undermined Petitioner's trial testimony which put forth herself[-]described alibi defense.

At trial, Petitioner testified that on the day of the Cabrera robbery/homicide (10/08/06), she was with [Ms.] Milliner in Milliner's apartment when Warner and Williams entered with a grocery cart.  The cart contained a black bag full of credit cards.  Petitioner further testified that the first time that she saw Mr. Williams or Mr. Warner on that day was when they entered Ms. Milliner's apartment with a grocery cart.  This grocery cart contained proceeds from the Cabrera robbery, including the victim's credit cards.  Petitioner told the jury that she did not know how her co-defendants obtained the decedent's credit cards, and that Warner and Williams forced her to use these cards at the convenience store.

However, in [the recorded] statement, Milliner stated that she was home alone on Sunday October 8, 2006 when she first saw Petitioner on that day when she entered the apartment that evening with codefendant Williams possessing money, cell phones, and several credit cards.

. . .

Hence, Ms. Milliner's statement undermines Petitioner's self-described alibi defense.  This defense is premised on Petitioner's claim that she was in Ms. Milliner's apartment at the time of the

> Cabrera robbery homicide and that she did not see codefendants until later that day when codefendant Williams arrived at that apartment with a grocery cart.  Rather than meeting her co-defendants at this apartment, Petitioner was identified by Ms. Milliner in her statement as entering this apartment with co-defendant Williams and jointly possessing cash, credit cards, and cell phones.  Since the Cabrera robbery/homicide occurred earlier in the day of 10/06/06, Ms. Milliner's identification of Petitioner entering her apartment after that crime undermines Petitioner's trial testimony suggesting that she was with Ms. Milliner at the time of the Cabrera robbery/homicide.

> Accordingly, as Milliner's statement is not exculpatory and would not have altered the trial's outcome, Petitioner's Claim 1 is denied.

(PCR Opinion at 13–16).

As with her other exhausted claims, Petitioner fails to argue or demonstrate that the state courts' determinations on these claims were contrary to or an unreasonable application of clearly established law or were based on an unreasonable determination of the facts.  The PCR trial court properly applied the *Brady* standard, and its findings were reasonable.  In particular, the Court agrees with the PCR trial court's assessment that the production of Milliner's statement would not have altered the outcome of the trial.  The statement itself was inculpatory as it undermined Petitioner's alibi defense, and it was also cumulative in light of Detective Chirico's report.  To the extent that Petitioner could have argued that the existence of a functional audio cassette containing the recorded statement would have had impeachment value with respect to Detective Chirico, there is no reasonable probability that it would have led to a different result in light of the totality of the evidence against her.  Accordingly, these grounds do not warrant habeas relief.

### D.    Claim Relating to Prosecutor's Comments (Ground Ten)

Petitioner's tenth ground for habeas relief alleges the prosecutor referred to Petitioner as a "liar" during cross examination, "engaged in a pattern of abusive remarks about the defendants,

including [P]etitioner, and demeaned defense counsel by complaining to the judge that counsel was wasting time and by making sarcastic and caustic remarks."  (Pet. at 19).

Petitioner raised this argument on direct appeal.  The Appellate Division rejected it as follows:

> In determining whether prosecutorial misconduct has occurred, we are guided by well-settled principles.  A prosecutor may not elicit improper or inflammatory testimony from a witness.  *See State v. McGuire*, 419 N.J. Super. 88, 140–42 (App. Div.), *certif. denied*, 208 N.J. 335 (2011).  "The foundational principle in [the] framework [of cross-examination] is that a prosecutor must have 'reasonable grounds' for posing questions during cross-examination that impugn a witness's credibility."  *State v. Daniels*, 182 N.J. 80, 99 (2004).

> With regard to their summations, prosecutors are "expected to make vigorous and forceful closing arguments to juries."  *State v. Frost*, 158 N.J. 76, 82 (1999).  They "are afforded considerable leeway in closing arguments as long as their comments are reasonably related to the scope of the evidence presented."  *Ibid.*  Still, a prosecutor's summation "is limited to commenting upon the evidence and the reasonable inferences to be drawn therefrom."  *State v. Swint*, 328 N.J. Super. 236, 261 (App. Div.), *certif. denied*, 165 N.J. 492 (2000).

> To warrant a reversal, the prosecutor's conduct "must have been clearly and unmistakably improper, and [it] must have substantially prejudiced defendant's fundamental right" to a fair trial.  *State v. Timmendequas*, 161 N.J. 515, 575 (1999) (internal quotation marks omitted), *cert. denied*, 534 U.S. 858, 122 S. Ct. 136, 151 L. Ed.2d 89 (2001).  In assessing the impact of prosecutorial misconduct, we must "consider the tenor of the trial and the responsiveness of counsel and the court to the improprieties when they occurred."  *Ibid.*

*See Diaz*, 2013 WL 6050161 at *7.  The Appellate Division noted that during cross-examination, the prosecutor asked Petitioner if she was "a liar" and during summation the prosecutor told the jury that Petitioner was "lying" and "acting" during her testimony.  *Id.*  Finding no error in the prosecutor's conduct, the Appellate Division explained that Petitioner's credibility was "clearly

25

an issue" at trial due to the four different versions of her involvement in the crime that she gave. *Id.* Thus, "[Petitioner's] credibility was clearly a proper subject for cross-examination" and during summation. *Id.* The Appellate Division also noted that when Petitioner objected to the prosecutor's comment, the trial court gave a curative instruction to the jury "that the defense does not have to prove anything in this case. It's the State's burden to prove the charges beyond a reasonable doubt." *Id.* (internal quotation marks omitted).

Federal habeas review is limited to determining whether the prosecutor's conduct "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974). In making this determination, courts must examine the entire proceedings of the case, including "the prosecutor's conduct, the effect of . . . curative instructions[,] and the strength of the evidence." *Id.*; *Moore v. Morton*, 255 F.3d 95, 107 (3d Cir. 2001) (first citing *Darden v. Wainwright*, 477 U.S. 168, 183 (1986); and then citing *Donnelly*, 416 U.S. at 643).

Here, after reviewing the controlling case law, the state court reasonably determined that the prosecutor's comments were not improper. None of the comments identified by Petitioner "infected the trial with unfairness." While Petitioner takes issue with the prosecutor's cross-examination and summation, none of the statements resulted in a denial of due process. Because the state court's holding did not result "in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law," or a "decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," habeas relief on Ground Ten is denied. 28 U.S.C. § 2254(d).

### E.     Cumulative Error Claim (Ground Nine)

Finally, in Ground Nine, Petitioner maintains that cumulative error denied her a fair trial. (Pet. at 18).  In order to constitute redressable "cumulative error," the deficiencies in a case must have "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Hein v. Sullivan*, 601 F.3d 897, 917 (9th Cir. 2010) (internal quotation marks omitted). "Cumulative errors are not harmless if they had a substantial and injurious effect or influence in determining the jury's verdict, which means that a habeas petitioner is not entitled to relief based on cumulative errors unless he can establish actual prejudice." *Fahy v. Horn*, 516 F.3d 169, 205 (3d Cir. 2008) (internal quotation marks and citation omitted).

Again, here, Petitioner's assertions lack merit.  Petitioner has failed to show that any of the alleged errors cast doubt over the proofs of Petitioner's guilt which were presented at trial. Moreover, Petitioner has failed to establish any prejudice from the alleged errors.   Finally, Petitioner has not shown that the alleged cumulative errors had a substantial and injurious effect or influence in determining the jury's verdict.  *Fahy*, 516 F.3d at 205.  Based on the forgoing, Ground Nine is denied.

## IV.     CERTIFICATE OF APPEALABILITY

Pursuant to 28 U.S.C. § 2253(c), unless a judge issues a certificate of appealability, an appeal may not be taken from a final order in a proceeding under 28 U.S.C. § 2254.  A certificate of appealability may be issued "only if the applicant has made a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  "A petitioner satisfies this standard by demonstrating that jurists of reason could disagree with the district court's resolution of [her] constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003) (citing *Slack*

*v. McDaniel*, 529 U.S. 473, 484 (2000)).  Here, Petitioner has failed to substantially show that her

constitutional rights were denied.  Accordingly, Petitioner is denied a certificate of appealability.

## V.      CONCLUSION

For the reasons set forth above, the § 2254 habeas petition is **DENIED**.  Likewise,

Petitioner's certificate of appealability is **DENIED**.  An appropriate Order follows.

Dated: June 12, 2024


s/Esther Salas
**Esther Salas, U.S.D.J.**